## ANGLIN v. CHESAPEAKE & O. RY. CO.

### Civil Action No. 414.

District Court, S. D. West Virginia.

April 22, 1948.

360

W. H. Darnall, of Huntington, W. Va., for petitioner.

Fitzpatrick, Strickling & Marshall, C. W. Strickling, and Amos Bolen, all of Huntington, W. Va. for respondent.

WATKINS, District Judge.

Petitioner has brought this action to secure reinstatement to his former position as a brakeman with the railway company under Section 8(e) of the Selective Training and Service Act of 1940, as amended, 50 U.S.C.A.Appendix, § 308(e). The single issue is one of fact. Did petitioner leave his position to perform training and service in the armed forces?

From the agreed statement of facts and oral evidence, the following facts appear: On July 21, 1942, petitioner was temporarily rejected by his local draft board for physical reasons, and placed in Class 1A–R by his Local Board in Huntington, W. Va., which classification meant that he was held in reserve for further examination. On March 9, 1943, he was inducted into the Navy, but was discharged March 23, 1943, on account of physical disability. On November 30, 1943, he entered employment with respondent as a laborer and was later upgraded and established seniority as a yard brakeman. After being discharged from the Navy he remained, for Selective Service purposes, in Class 1C (discharged). Desiring to get back into the military service, and feeling that he was physically fit for such service, he subsequently requested that he be placed in Class 1A, and on July 21, 1944, he was reclassified by his Local Board and placed in Class 1A. On March 29, 1945, he was ordered to report for "pre-induction physical examination" on April 9, 1945. He received this notice when he went home from work on March 30. He did not again report for work. He says he ceased his employment "because I was going into the armed services." He had some business he wanted to look after. His father and mother were separated and he wanted to visit both of them before leaving. His brother who was then home had spent five years in the service without a furlough. He felt that if he passed his physical examination on April 9, he "could expect to be called at any time." He had

previously received such a notice to report for physical examination and was actually inducted into service two weeks after such examination. Under the Selective Service rules then in force he could be inducted ten days after passing the physical examination, but in practice, actual induction by this particular Local Board occurred on an average of about 30 days after registrant passed the physical examination, but in some cases more than 90 days thereafter. He felt there was considerable doubt as to whether he would pass the examination, although there was good reason to believe that he would be accepted. He felt that he was in fact physically fit, and with full knowledge of his previous rejection, he realized that his Local Board had now taken him out of the classification for the physically unfit and placed him in Class 1A, the classification for those immediately available for military service. If he was not accepted for military service on April 9, he intended to return to his employment with respondent. He reported on that day, passed his physical examination, and was accepted. They told him that same day that he had passed and that he could expect to be called for actual induction any day. Under date of April 16 the Local Board mailed him the official written notification that he had been accepted for military service. About April 15–20, the respondent was badly in need of railroad employes and Engel M. Green, the terminal trainmaster in charge of employment of brakemen went to see petitioner to ask why he had not been working. Green testified as follows: "So I got busy and I knew Mr. Anglin stayed around up there near the hospital at that drugstore, at least I had seen him there frequently and I went up there to see if I could locate him and I found him and I asked him why he wasn't working. And he says, 'well, I have been called in to the service,' and I says, 'well, why didn't you say something to us about it.' 'Well,' he said, 'I didn't think at the time it was necessary, but I was going to let you know,' something to that effect, 'before I left,' and he says, 'will 't be necessary for me now to go to the office.' I said 'no, if you have been re-called in the serv-

ice you are working for Uncle Sam and it will not be necessary for you to report for duty on the yard.' So that was about the extent of the conversation. He said he wanted, he had some things to look after and he wanted, I believe, to visit his parents before he left. He didn't know just what date he would go but he had some things to look after and I said, 'All right, as far as I am concerned, why you're in the Army,' and that was about the extent of it."

On May 3, 1945, petitioner was ordered by his Local Board to report for induction on May 14, at which time and place he appeared, but because his records were incomplete he was sent home with advice that he would be called later. Petitioner expected to be called most any day. Accordingly, on June 4, 1945, he was notified to report for induction on June 15, 1945, when he was actually inducted into the U. S. Marine Corps and sent to Paris Island, S. C., for duty, from which place he was honorably discharged from service, for physical reasons, on August 11, 1945. He applied for and was reinstated in his old position with defendant on September 1, 1945, with full seniority. But upon objection made by the local railroad union on October 20, 1945, respondent removed petitioner from service as a brakeman and removed his name from the seniority roster. It was claimed that petitioner had forfeited his seniority as a yard brakeman by reason of failure to comply with Rule 25 of the Yardmen's Agreement, namely, being absent from duty without leave for more than 60 days prior to his induction into military service on June 15, 1945, as contracted and provided for in collective bargaining agreement between the railway company and the union, of which petitioner was a member. Such agreement provides in substance that yardmen will not be granted a leave of absence for more than 60 days without the written consent of the company and the union.

Respondent contends that these facts show that petitioner did not leave his job to go into military service; that at the time he was actually inducted into service (June 15, 1945) he had lost his job by

reason of the agreement between the railroad and the union of which he was a member; that at the time of such induction he had been absent for more than 60 days, had then lost his job, and did not have any job to leave to go into the military service. I am unable to agree with this contention. On the contrary, it is my opinion that the evidence clearly shows that he left his position to perform training and service under the Selective Training and Service Act. He left his employment the same day he received his notice to report for physical examination. While this could have been a mere coincidence, no other explanation is offered. He did not thereafter obtain or seek other employment, but proceeded to get ready to leave by settling his business affairs and visiting his parents. While he had previously been rejected for military service and placed in the appropriate classification for the physically disabled, he wanted to get back into service, and applied to his Local Board for a 1A classification, the appropriate classification for those who were available for service. When the Local Board granted his request by putting him in Class 1A and ordered him to report for pre-induction physical examination he had good reason to believe that the Local Board was now ready to accept him. The Local Board undoubtedly had before it all the information concerning his previous discharge and the reasons therefor, and would not have reclassified him and called him for pre-induction physical examination if there was not some reason to believe that he would then be accepted. At any rate that is just what happened. He was accepted. This occurred just 10 days after he left his employment. He was then notified that he might be called any day. Thereafter he promptly told his employer of this intentions to enter the service and was advised that he need not report for duty on the yard.

■ It is, of course, true that some 10 days elapsed between the time that he left his employment and the date he was accepted for military service, but this is even a shorter time than would elapse in the average case of one who was leaving his employment to enlist in the service. The wise thing for him to have done would have been to write a letter to his employer, saving a copy thereof, setting forth the reason he did not report for work. However, there is nothing in the law requiring any such notice to the employer. He is entitled to the reemployment benefits of the act if he left his employment to enter the military service. He did notify his employer of his intentions about April 15.

■ It is also quite significant that his employer recognized his rights under the act by full reinstatement immediately upon his discharge. It was not until after the union made protest and called attention to the existing union agreement that he was discharged. This agreement in no way affected petitioner's right to reinstatement. Rudisill v. C. & O. Ry. Co., 4 Cir., 175 F.2d 167. In Fishgold v. Sullivan Corp., 328 U.S. 275, 285, 66 S.Ct. 1105, 1111, 90 L.Ed. 1230, 167 A.L.R. 110, the Supreme Court said: "This legislation is to be liberally construed for the benefit of those who left private life to serve their country in its hour of great need. See Boone v. Lightner, 319 U.S. 561, 575, 63 S.Ct. 1223, 1231, 87 L.Ed. 1587. And no practice of employers or agreements between employers and unions can cut down the service adjustment benefits which Congress has secured the veteran under the Act. Our problem is to construe the separate provisions of the Act as parts of an organic whole and give each as liberal a construction for the benefit of the veteran as a harmonious interplay of the separate provisions permits." Therefore, this case must stand or fall upon the question of whether petitioner quit work for the purpose of entering the military service, or for some other purpose. If that was the reason he did not report for duty after March 30, then he is entitled to reinstatement, as Congress has provided, notwithstanding any provisions of any contract between the employer and the union relating to notice to the employer or to the union, or relating to the manner of taking a leave of absence. Bryant v. Brotherhood of Railroad Trainmen, D.C., 74 F. Supp. 510; Trailmobile Co. v. Whirls, 6 Cir., 1946, 154 F.2d 866. In fact defendant was actually accepted for military service 10 days after he quit work and well within the 60 days' period mentioned in the agree-

ment. After being accepted, the date of his actual induction was a matter over which he had no control.

 Petitioner waited from October 20, 1945, when he was discharged, to April 3, 1947, a period of about 18 months, before filing this action. Because of this unreasonable delay he should be allowed compensation only from April 3, 1947. See Thompson v. C. & O. Ry. Co., 76 F.Supp. 304, and cases there cited.

Petitioner is entitled to be reinstated to his former position as brakeman with no reduction in seniority. In addition he is entitled to receive compensation which he would have earned if reemployed in his old position but only for the period beginning April 3, 1947, the date of the institution of this action, less what petitioner has earned during this same period in other employment. The parties will make the computation as to damages and insert the same in an appropriate order for entry.